**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| MOBILE EQUITY CORP., *Plaintiff*, | § | |
| v. | § | CASE NO. 2:24-CV-00641-RWS-RSP |
| EXXON MOBILE CORP., *Defendant*. | § | |

# CLAIM CONSTRUCTION ORDER

In this patent case, Mobile Equity Corporation (MEC) alleges infringement of U.S. Patents 8,589,236 and 10,535,058 by Exxon Mobile Corporation. The patents, which are related and share the same disclosure,[1] concern "electronic commerce and . . . using mobile communication devices to execute a commercial transaction." '236 Patent at 1:12–14; *see also* '058 Patent at 1:14–16.

The parties dispute the scope of four claim terms or phrases from the two patents. Having considered the parties' briefing, along with arguments of counsel during a December 18, 2025 hearing, the Court resolves the disputes as follows.

## I. BACKGROUND

The patents relate to using mobile communication devices for commercial transactions. '236 Patent at 1:13–14. In the Background, the patents describe a typical "quick and reliable" credit card transaction, in which a merchant receives a customer's card information at a point-of-sale terminal. Prior-art systems and methods send that information to a clearinghouse, which

[1] The '058 Patent issued from application serial no. 14/082,425, which is a continuation of the application from which the '236 Patent issued. '058 Patent at [21], [63].

authenticates the information and routes the transaction accordingly. The clearinghouse then executes the transaction with an appropriate financial institution. *See generally id.* at 1:18–38.

This prior-art methodology, of course, requires that the customer have a credit card, which the patent suggests is "less than optimal." Many customers might not be eligible for a credit card or might have had their card lost, stolen, or damaged. *See generally id.* at 1:39–63.

To address this less-than-optimal methodology, the patent teaches a system (see Fig. 1, below) and method for allowing a customer to use a mobile communication device to "initiate and execute a transaction [with a merchant] by reversing the conventional direction of point of sale transaction initiation." *See* '236 Patent at 2:10–17. Generally, the customer uses a mobile device (102) to initiate the transaction by causing a merchant ID to be sent to a payment processing server (110). *Id.* at [57]. In response, that server requests transaction information from the associated merchant (104). *Id.* After the merchant provides the transaction information (e.g., the sales amount) to the server, the server authenticates the customer and initiates a purchase transaction with the appropriate financial institution (118). *Id.*; *see also id.* at 2:32–47.




**Figure 1 of U.S. Patent 8,589,236**

MEC asserts independent Claim 1 of each patent, which are similar. Claim 1 of the ’236 Patent recites:

> 1. A method for conducting a transaction between a merchant and a customer, the customer using a mobile device, the method comprising:
>
> receiving a merchant identifier from the mobile device operated by the customer, the merchant identifier indicating a request to initiate a transaction with a merchant terminal identified by the merchant identifier, wherein the merchant identifier does not indicate a transaction amount for the transaction;
>
> sending, in response to receiving the merchant identifier, a transaction information request to the merchant terminal associated with the merchant identifier;
>
> receiving transaction information from the merchant terminal in response to the transaction information request, the transaction information including the transaction amount for the transaction;
>
> identifying a purchase account associated with the customer and a deposit account associated with the merchant; and
>
> initiating the transaction between the merchant and the customer for the transaction amount received from the merchant terminal and the identified purchase account associated with the customer and the identified deposit account associated with the merchant.

’236 Patent at 21:5–28. Relative to Claim 1 of the ’236 Patent, the ’058 Patent recites a “terminal” instead of a “merchant,” a “terminal identifier” instead of a “merchant identifier,” a “customer account” rather than a “purchase account associated with the customer,” and a “terminal account” rather than a “deposit account associated with the merchant”:

> 1. A method for conducting a transaction between a terminal and a customer by a payment processing server, the customer using a mobile device, the method comprising:

> receiving, at the payment processing server, a terminal identifier from the mobile device operated by the customer, the terminal identifier indicating a request to initiate a transaction with a terminal identified by the terminal identifier, wherein the terminal identifier does not indicate a transaction amount for the transaction;
>
> sending, at the payment processing server, in response to receiving the terminal identifier, a transaction information request to the terminal associated with the terminal identifier;
>
> receiving, at the payment processing server, transaction information from the terminal in response to the transaction information request, the transaction information including the transaction amount for the transaction;
>
> identifying, at the payment processing server, a customer account associated with the customer and a terminal account associated with the terminal; and
>
> initiating, at the payment processing server, the transaction between the customer account and the terminal account for the transaction amount received from the terminal.

'058 Patent at 21:40–63.

## II. LEGAL STANDARDS

"[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). As such, if the parties dispute the scope of the claims, the court must determine their meaning. *See, e.g.*, *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1317 (Fed. Cir. 2007) (Gajarsa, J., concurring in part); *see also Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 390 (1996), *aff'g*, 52 F.3d 967, 976 (Fed. Cir. 1995) (*en banc*).

Claim construction, however, "is not an obligatory exercise in redundancy." *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). Rather, "claim construction is a matter of [resolving] disputed meanings and technical scope, to clarify and when necessary to explain

what the patentee covered by the claims . . . ." *Id.* A court need not "repeat or restate every claim term in order to comply with the ruling that claim construction is for the court." *Id.*

When construing claims, "[t]here is a heavy presumption that claim terms are to be given their ordinary and customary meaning." *Aventis Pharm. Inc. v. Amino Chems. Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013) (citing *Phillips*, 415 F.3d at 1312–13). Courts must therefore "look to the words of the claims themselves . . . to define the scope of the patented invention." *Id.* (citations omitted). The "ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.,* as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1313. This "person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.*

Intrinsic evidence is the primary resource for claim construction. *See Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1348 (Fed. Cir. 2010) (citing *Phillips*, 415 F.3d at 1312). For certain claim terms, "the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips,* 415 F.3d at 1314; *see also Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005) ("We cannot look at the ordinary meaning of the term . . . in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history."). But for claim terms with less-apparent meanings, courts consider "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean . . . [including] the words of the claims themselves, the remainder of the specification, the

prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Phillips*, 415 F.3d at 1314.

## III. THE LEVEL OF ORDINARY SKILL IN THE ART

The level of ordinary skill in the art is the skill level of a hypothetical person who is presumed to have known the relevant art at the time of the invention. *In re GPAC*, 57 F.3d 1573, 1579 (Fed. Cir. 1995). In resolving the appropriate level of ordinary skill, courts consider the types of and solutions to problems encountered in the art, the speed of innovation, the sophistication of the technology, and the education of workers active in the field. *Id.* Importantly, "[a] person of ordinary skill is also a person of ordinary creativity, not an automaton." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007).

Here, MEC says a skilled artisan "at the time of the inventions would have had a bachelor's degree in computer science, computer engineering, or equivalent degree with two years of experience or a master's degree in computer science, computer engineering, or equivalent degree." Dkt. No. 36 at 6. Exxon generally agrees with that characterization, but suggests the experience should relate to computer systems and their communications. Dkt. No. 40 at 7. The parties appear to agree, however, that the differences between these levels of skill are not material to the disputes. *Id.*

## IV. THE DISPUTED TERMS

### A. "merchant" ('236 Patent, Claims 1, 5, 10, 12)

| MEC's Construction | Exxon's Construction |
|---|---|
| Plain and ordinary meaning (no construction necessary).<br>Alternatively, "provider of a good or service" | "retailer where the transaction is conducted" |

Claim 1 recites:

> 1. A method for conducting a transaction between a **merchant** and a customer, the customer using a mobile device, the method comprising:
>
> . . .
>
> identifying a purchase account associated with the customer and a deposit account associated with the **merchant**; and
>
> initiating the transaction between the **merchant** and the customer for the transaction amount received from the merchant terminal and the identified purchase account associated with the customer and the identified deposit account associated with the **merchant**.

’236 Patent at 21:5–28 (emphasis added).

Exxon’s request for construction comes from what it says is even MEC’s inability to understand the term. Dkt. No. 40 at 19. According to Exxon, MEC identifies two different entities as the “merchant”: (1) Exxon and (2) the third-party entities to whom Exxon sells fuel. *Id.* Exxon says the claims as drafted refer to a transaction between a customer and a particular merchant, not a transaction between a customer and several entities. Thus, concludes Exxon, construction is necessary “to resolve the parties’ dispute as to who is a ‘merchant’ (e.g., ExxonMobil or branded wholesalers) within the meaning of the MEC patents.” *Id.* at 20.

MEC frames the dispute differently—whether a “merchant” can be either a “retail” or a “non-retail” merchant. Dkt. No. 41 at 1. It stresses the term “retail” is used only once in the specification, where suggests a “merchant” is not limited to a “retail” merchant. Dkt. No. 36 at 7 (citing ’236 Patent at 9:35–39). MEC says this distinction is confirmed by Claim 8, which recites “a merchant type,” thereby confirming the term has different categories. *Id.* MEC also objects to the second part of Exxon’s construction, which limits the location of the “merchant” to “where the transaction is conducted.” *Id.* at 9–10.

At the hearing, the Court proposed a construction of "seller of a good or service to a customer." Exxon agreed with that construction given the Court's preliminary construction for "terminal." Hr'g Tr., Dkt. No. 68 at 14:20–22. MEC, however, questioned whether that construction requires a completed transaction, *id.* at 15:4–17, to which the Court responded it wouldn't, *see id.* at 15:18–24 ("I don't think there's any doubt . . . an entity as a seller doesn't involve proof of a completed sale in a particular instance."). MEC also noted Exxon's position that it is not a party to the transactions at issue, *id.* at 16:7–18, but that's an infringement question rather than a claim-construction issue. The Court adopts its preliminary construction for "merchant" of "seller of a good or service to a customer." *See, e.g.*, Mobile Payment Systems (2017), Dkt. No. 36-11 (defining "merchant" as "[a]n entity that has products or services to sell").

**B. "terminal" ('236 Patent, Claim 1, 2, 5, 14; '058 Patent, Claims 1, 14)**

| MEC's Construction | Exxon's Construction |
|---|---|
| Plain and ordinary meaning (no construction necessary).<br>Alternatively, "an electronic device connected to a network that is specialized by its hardware and/or software to facilitate a payment transaction" | "a point-of-sale terminal" |

This dispute centers on whether the recited "terminal" must be at the point of sale. Exxon makes three arguments for its construction. First, "in almost every instance that the specification uses the term 'terminal,' it is qualified with the term 'point-of-sale.'" Dkt. No. 40 at 8. Second, during prosecution, the applicant distinguished the claims from the prior art by asserting that art was "inapplicable to the method of claim 1." *Id.* at 9 (quoting Dkt. No. 35-1 at 23). Third, MEC made the same distinction during related IPR proceedings. *Id.* at 10 (citing Patent Owner's Prelim. Resp, Dkt. No. 40-1 at 5–6, 18, 25, 29).

MEC makes two arguments in response. First, the specification contradicts Exxon's construction because the patentee described a point-of-sale terminal more broadly than the term is normally understood. Dkt. No. 36 at 15. Second, claim differentiation "make[s] it absolutely clear that a 'terminal' is not always a 'point of sale terminal.'" *Id.* at 16 (citing three dependent claims that recite "a point-of-sale terminal").

At the hearing, the Court provided a preliminary construction of "a terminal that is located with the merchant." MEC objected to the phrase *"the* merchant," suggesting it should be "*a* merchant," because the terminal "can be located with potentially some other business." Hr'g Tr., Dkt. No. 68 at 18:2–3. MEC expressed concern that "the merchant" might be interpreted to require an accused terminal to be owned or controlled by the owner of the premises. According to Exxon, however, construing the term to reference "a merchant" would open up the claim scope to merchants not involved in the transaction. *Id.* at 26:3–14.

The Court generally agrees with Exxon that the merchant terminal must be at the point of sale—that is, where the transaction is occurring. Almost every reference in the specification to "terminal" is preceded with "point of sale." *See, e.g.*, '236 Patent at 1:17–21, 2:13–17, 2:48–50, 3:6–9, 6:15–19, 8:4–6, 8:17–31, 10:26–30, 13:6–12, 13:33–37, 14:14–16). And the few exceptions are tied closely to "point of sale" in other ways. *See id.* at 1:21–23 ("to initiate a point of sale, a merchant can enter the total sale amount in a *terminal*." (emphasis added)); *id.* at 8:25–31 (noting "*point of sale terminals* can include established transaction *terminals*, such as an ATM or vending machine . . . . [W]here existing transaction *terminals* . . . are used, the *terminals* can be updated via a firmware update to enable them to receive transaction information requests from a payment processing server[.]" (emphasis added)).

Even more compelling than the specification, during prosecution and in a related IPR proceeding, the applicant characterized the terminal of the present invention as a "point of sale terminal." *See, e.g.*, '236 File History, Dkt. No. 35-1 at 23 (asserting the method disclosed by the prior art "is inapplicable to the method of claim 1 that . . . requests transaction information from the point-of-sale terminal"); '058 File History, Dkt. No. 35-2 at 44 ("The claims of this application . . . obviate additional technology required for a mobile device and a *point of sale terminal* to communicate with one another."); '236 IPR PO Prelim. Resp., Dkt. No. 40-1 at 5 ("The approach of the MEC Patents has several significant benefits," including that it "allows customers to pay at point-of-sale terminals using an application on their mobile device."). As such, the Court must give some meaning to "point of sale," which it concludes requires the terminal to be at the location where the transaction is occurring. This is consistent with the patent's description of the prior art, and how the patent reverses the flow of the prior-art's transaction. *See* '236 patent at 2:10–13 ("the present invention . . . allow[s] a customer to use a mobile communications device to initiate and execute a transaction by reversing the conventional direction of point of sale transaction initiation.").

Regarding MEC's claim-differentiation argument, "'claim differentiation is a guide, not a rigid rule.'" *Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1381 (Fed. Cir. 2006) (quoting *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1538 (Fed. Cir. 1991)). After all, "claim drafters can also use different terms to define the exact same subject matter." *Id.* at 1380. Claim differentiation cannot be trumped by clear lexicography or disclaimer in the intrinsic record, as the Court finds here.

There is, however, some ambiguity about what the patent means by "point-of-sale terminal." A layperson, for example, might understand a POS terminal to consist of a keypad, a screen,

and a card reader. *See* '236 Patent at 8:20–22 ("A point of sale terminal can include a station wherein the merchant can swipe or key-in a customer's credit card or debit card to execute a purchase transaction."). But as MEC notes, the patent uses the term more broadly, encompassing ATMs and other devices not typically considered POS terminals, like mobile phones, laptops, and tablets. Dkt. No. 36 at 15 (citing '236 Patent at 8:17–31). For that reason, the Court does not adopt Exxon's proposed construction.

Finally, regarding MEC's concerns about requiring the "merchant terminal" to be owned by the premises owner, the term by itself does not require that. Here, "terminal" and "merchant terminal" refer to structure, not who owns or controls that structure. At most, "merchant" in "merchant terminal" refers to the side of the transaction for which the terminal is used. Accordingly, mindful of the specification and prosecution history that requires the terminal to be at the location where the transaction is occurring, the Court construes this term as "a terminal that is located with a merchant."

### C. "a request to initiate a transaction" ('236 Patent, Claim 1; '058 Patent, Claim 1)

| MEC's Construction | Exxon's Construction |
|---|---|
| Plain and ordinary meaning (no construction necessary). | "a request to initiate a transaction for a known or readily ascertainable amount" |

The first and third steps of Claim 1 of the '236 Patent recite:

> receiving a merchant identifier from the mobile device operated by the customer, the merchant identifier indicating **a request to initiate a transaction with a merchant terminal identified by the merchant identifier**, wherein the merchant identifier does not indicate a transaction amount for the transaction;
>
> . . .

> receiving transaction information from the merchant terminal in response to the transaction information request, the transaction information including **the transaction amount for the transaction**[.]

'236 Patent at 21:8–20 (emphasis added). Similarly, the first and third steps of Claim 1 of the '058 Patent recite:

> receiving, at the payment processing server, a terminal identifier from the mobile device operated by the customer, the terminal identifier indicating **a request to initiate a transaction with a terminal identified by the terminal identifier**, wherein the terminal identifier does not indicate a transaction amount for the transaction;
>
> . . .
>
> receiving, at the payment processing server, transaction information from the terminal in response to the transaction information request, **the transaction information including the transaction amount for the transaction**[.]

'058 Patent at 21:43–56 (emphasis added).

Exxon says the intrinsic record requires the transaction amount to be "known or readily ascertainable" at the time of the request to initiate the transaction. For support, Exxon points to portions of the prosecution history where the applicant added the "wherein" clause at the end of the limitations. Dkt. No. 40 at 13. Exxon argues the "wherein" clauses would be meaningless unless there is already a known or readily ascertainable transaction amount that could be excluded at that time. *Id.* Exxon also asserts the first step's antecedent basis provided for "transaction amount" in the third step requires that the transaction amount already be known. *Id.* at 15–16.

MEC makes three arguments in response. First, while the specification refers to "total sale amount" and "total purchase amount," that's information the merchant *can* provide, but is not required to initiate a transaction. Dkt. No. 36 at 17–18. Second, the claims' structure weighs against

Exxon's construction by requiring the transaction amount after the request rather than before it. *Id.* at 18. Finally, there's no reason for the amount to be known before the transaction is initiated. *Id.* at 19.

The Court agrees with MEC. Regarding Exxon's assertion about the meaningless "wherein" clause, that language simply excludes embodiments that, but for that negative limitation, would use the merchant identifier to indicate a transaction amount. It says nothing about whether the transaction amount *must* be known at that time. Moreover, even assuming, as Exxon urges, "the applicant repeatedly recognized that the benefit of its invention would allow a clerk to make quick entry of items making up a transaction," Dkt. No. 40 at 14–15, that also says nothing about needing the transaction amount when making the request to *initiate* the transaction.

The Court also rejects Exxon's antecedent-basis argument. Analogizing to *Process Control Corp. v. HydReclaim Corp.*, 190 F.3d 1350, 1356–57 (Fed. Cir. 1999), Exxon says that because the first step's recitation of "*a* transaction amount for the transaction" provides antecedent basis for the third step's "*the* transaction amount for the transaction," the first step requires that the transaction amount must be known during the first step. Dkt. No. 40 at 16.

*Process Control*, however, is distinguishable. The patent concerned "gravimetric blenders used in the plastics industry," and the claim at issue was directed to "[a] method of metering different material ingredients for discharge to a material processing machine." *Process Control*, 190 F.3d at 1354. The second step of the method required "discharging material from [a] common hopper to [a] processing machine at *a discharge rate*." *Id.* The fourth step required "determining the material processing rate of the processing machine from [in part] *the discharge rate* of the material from the common hopper to the processing machine." *Id.* at 1354–55. The parties disputed whether "the discharge rate" in the fourth step referred to "a discharge rate" in the second step, or

whether the fourth step was referring to a different discharge rate defined in the written description. *Id.* at 1355.

The district court concluded the latter. Specifically, "[t]he district court concluded that 'if "discharge rate" is construed [to be the same rate as in the second step as urged by *Process Control*], this specification would be nonsensical." *Process Control*, 190 F.3d at 1355.

The appellate court reversed for three reasons. First, it concluded Process Control's construction was consistent with the antecedent basis for "discharge rate" provided earlier in the claim. *Process Control*, 190 F.3d at 1356. Second, contrary to the district court's conclusion, the specification did not clearly redefine "the discharge rate" for the fourth step. *Id.* at 1357. Finally, even if Process Control's construction didn't make technical sense, which both parties conceded was the case, that doesn't mean the claim language is unclear and should be redrafted. *Id.*

Here, however, the claim language is distinguishable, as is the reasoning. For one, "a transaction amount" appears in a negative limitation. Also, the parties don't appear to dispute that a transaction, at least to be complete, must have a transaction amount, and that "the transaction amount" of the third step is the amount for the transaction requested to be initiated in the first step. Nothing about the reasoning in *Process Control* requires the Court to read "a transaction amount" in the first step as meaning a transaction amount exists at that time. It's simply a recognition that the transaction amount for the transaction in the preamble, whether already known at the time of the request or determined later in the transaction, doesn't need to be indicated by the merchant identifier in the first step.

Ultimately, the question is whether a transaction amount must be known or readily ascertainable at the time of the request to *initiate* the transaction. Because the Court concludes it doesn't, it rejects Exxon's position and will give this term a "plain and ordinary meaning" construction.

**D. "terminal account" ('058 Patent, Claim 1)**

| MEC's Construction | Exxon's Construction |
| --- | --- |
| Plain and ordinary meaning (no construction necessary). | "an account of the retailer that operates the terminal" |

Whereas the claims of the '236 Patent recite a "deposit account associated with the merchant," Claim 1 of the '058 Patent recites "a terminal account associated with the terminal." The parties dispute whether that terminal account is necessarily "an account of the retailer that operates the terminal."

MEC calls this a narrow dispute in which Exxon is trying to incorporate its construction for "merchant" in the '236 Patent into Claim 1 of the '058 Patent. Dkt. No. 36 at 20. It also questions what it means to "operate a terminal" or for a terminal to "belong to" a retailer. *Id.* at 23.

Exxon responds with three reasons for its construction. First, the construction is a "natural result of the agreed construction for 'payment processing server.'"[2] Dkt. No. 40 at 26. Second, the specification refers to "merchant accounts," and "nothing in the intrinsic record describ[es] an account 'associated' at the terminal level with anything other than a merchant." *Id.* at 27. Third, the applicant explained in the prosecution history that the account for the terminal is a merchant account. *Id.*

The Court agrees with MEC. Just like a "merchant account" is an account associated with a merchant, a "terminal account" is an account associated with a terminal. While the notion of such an association is odd—accounts are normally associated with people or businesses—that doesn't

[2] MEC says Exxon did not disclose this argument along with the potential agreement and asks the Court to consider replacing "merchant" with "terminal" in the agreed construction for "payment processing server" for the '058 Patent. Dkt. No. 41 at 10.

necessarily prevent the same relationship from applying here. Exxon's construction, on the other hand, would ignore the claim language and instead associate the terminal with the merchant.[3] Regarding Exxon's prosecution-history argument, while there may be a written-description issue, nowhere does Exxon point to statements by the applicant that clearly and unambiguously define a "terminal account" as a "merchant account" or "account of a retailer," or suggest those terms are used interchangeably. Accordingly, the Court construes "terminal account" as "an account associated with a terminal."

## V. CONCLUSION

| Disputed Term | The Court's Construction |
|---|---|
| "merchant"<br>('236 Patent, Claims 1, 5, 10, 12) | "seller of a good or service to a customer" |
| "terminal"<br>('236 Patent, Claim 1, 2, 5, 14; '058 Patent, Claims 1, 14) | "a terminal that is located with a merchant" |
| "a request to initiate a transaction"<br>('236 Patent, Claim 1, 2, 5, 14; '058 Patent, Claims 1, 14) | Plain and ordinary meaning |
| "terminal account"<br>('058 Patent, Claim 1) | "an account associated with a terminal" |

The Court **ORDERS** each party not to refer, directly or indirectly, to its own or any other party's claim-construction positions in the presence of the jury. Likewise, the Court **ORDERS** the parties to refrain from mentioning any part of this opinion, other than the actual positions adopted by the Court, in the presence of the jury. Neither party may take a position before the jury that

[3] This is closer to *Process Control*'s reasoning discussed *supra*. Even if the claim doesn't appear at this stage to make technical sense, the claim language itself is nonetheless clear.

contradicts the Court's reasoning in this opinion. Any reference to claim construction proceedings is limited to informing the jury of the positions adopted by the Court.

**SIGNED this 5th day of February, 2026.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE